UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| VANDOR CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 1:15-cv-00838-RLY-TAB |
| MATTHEWS INTERNATIONAL CORP., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

**DECLARATION OF JOSEPH F. RAKOW IN SUPPORT OF DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

I, Joseph F. Rakow, hereby declare as follows:

**I.       INTRODUCTION AND QUALIFICATIONS**

1.       My name is Joseph F. Rakow.  My findings, as set forth herein, are based on my education and background in the fields discussed below.

2.       I have been retained on behalf of Petitioner Matthews International Corporation ("Matthews") to provide this Declaration concerning technical subject matter relevant to the Motion for Summary Judgment ("Motion") concerning U.S. Patent No. 8,104,151 (the "'151 patent," **Exhibit 7**).  I reserve the right to supplement this Declaration in response to additional evidence that may come to light.

3.       I am over 18 years of age.  I have personal knowledge of the facts stated in this Declaration and could testify competently to them if asked to do so.

4.       My Curriculum Vitae is submitted herewith as **Exhibit J**.

5.      I hold Ph.D. and M.S. degrees in Aerospace Engineering from the University of Michigan, and a B.S. in physics from the University of California, Davis.  My graduate training and research focused on the mechanics and performance of lightweight structures, including fiber-reinforced composite structures and sandwich structures — aerospace versions of the pliable cardboard construction contemplated in the subject patent.  For my dissertation, I developed, built, and tested a novel lightweight sandwich structure for hypersonic aircraft, utilizing the University's Advanced Composite Structures Laboratory and funding from NASA.  During my time as a graduate student, I was also employed by the Department of Energy to conduct applied research on lightweight structures for a variety of national weapons systems.

6.      I currently serve as a Principal Engineer and the Director of Exponent's Mechanical Engineering practice, where I have been consulting full time for the past 13 years.  A significant portion of my practice has been dedicated to the development, performance, and failure of lightweight structures.  This has spanned a wide range of products including aircraft, spacecraft, sporting equipment, wind turbines, medical devices, and civil infrastructure.  Notably, this work has also included packaging systems and intellectual property matters.  In one engagement, I helped a large international packaging company develop reinforcements for cardboard containers.  In another, I was a designated expert in a trade dress dispute involving lightweight shipping containers known as intermediate bulk containers, for which I analyzed the functionality of various elements of the disputed containers.  These are among hundreds of engagements focused specifically on lightweight structures.

7.      I actively publish in the scientific and industrial literature, and I am frequently invited to present at national and international technical conferences.  The focus of my publications and presentations has been on the use and performance of lightweight structures in industrial

applications.  I am a Visiting Lecturer in the Aeronautics and Astronautics Department at Stanford University, where I regularly teach about lightweight structures.

8.      I am often called upon by the United States government to address technical issues involving lightweight structures.  I teach courses on composite structures to the Department of Defense.  I authored the chapter on composite structures for the International Civil Aviation Organization (ICAO) Manual of Accident and Incident Investigation.  I am a Working Group Chair for the Federal Aviation Administration in their CMH-17 organization, which develops standards for lightweight composite structures.  I am a licensed professional engineer in the state of California.

9.      I was recently elected to the rank of Fellow in the American Society of Mechanical Engineers (ASME).  Designation as a Fellow is in recognition of significant engineering achievements and contributions to the engineering profession.  The designation is bestowed on fewer than 3% of the organization's membership.  ASME cited my work on lightweight structures as a basis for this recognition.

10.     My employer, Exponent, is being compensated at a rate of $495.00 per hour for my study and testimony in this matter.  I am also being reimbursed for reasonable and customary expenses associated with my work and testimony in this investigation.   No part of my compensation is contingent on the outcome of this matter nor is it contingent on the specifics of my testimony.

11.     I have testified in state and federal courts, and before international arbitration tribunals, as an engineering expert in matters involving lightweight structures and other mechanical systems.

12.     Over the past four years I have testified in eight federal and state court depositions, three arbitration hearings, and one state court hearing.

## II.     MATERIALS RELIED ON IN FORMING MY OPINION

13.     My opinions are based on my education, research and experience, as well as my study and investigation of the relevant materials.  I have considered the materials identified herein.

14.     I may rely upon the identified materials and/or additional materials to respond to arguments raised by the Patent Owner.  I may also consider additional documents and information in forming any necessary opinions – including, but not limited to, documents not yet provided to me.

15.     My investigation and study of the materials produced in this investigation is ongoing and I will continue to review any new material provided.  The opinions in this report are the opinions I have formed to date.  I reserve the right to revise, supplement, and/or amend my opinions stated herein based on new information and on my continued analysis of the materials already provided.

16.     This declaration is intended to be used solely for the purposes of the legal proceedings identified on the front page of this document, and any reuse of this document for other purposes is at the sole risk of the user.

17.     In addition to reviewing the '151 patent, I also reviewed and considered each of the documents listed as Exhibits 1-14 and A-M, which are being filed with the Motion.

## III.     UNDERSTANDING OF THE GOVERNING LAW

18.     I understand that a patent claim is invalid if it is obvious in view of the prior art.  I further understand that invalidity of a claim requires that the claim be obvious from the perspective of a person of ordinary skill in the art at the time the invention was made.

4

### A.  Invalidity by Obviousness

19.     I have been informed that a patent claim is invalid as "obvious" under 35 U.S.C. § 103 if it would have been obvious to one of ordinary skill in the art, taking into account (1) the scope and content of the prior art; (2) the differences between the prior art and the claims; (3) the level of ordinary skill in the art; and (4) any so called "secondary considerations" of non-obviousness; which include: (i) "long felt need" for the claimed invention; (ii) commercial success attributable to the claimed invention; (iii) unexpected results of the claimed invention; and (iv) "copying" of the claimed invention by others.  I further understand that it is improper to rely on hindsight in making the obviousness determination.  My analysis of the prior art is made as of the time the invention was made.

20.     I have been informed that a claim can be obvious in light of a single prior art reference or multiple prior art references.  I further understand that exemplary rationales that may support a conclusion of obviousness include:

(A)     Combining prior art elements according to known methods to yield predictable results;

(B)     Simple substitution of one known element for another to obtain predictable results;

(C)     Use of known technique to improve similar devices (methods, or products) in the same way;

(D)     Applying a known technique to a known device (method, or product) ready for improvement to yield predictable results;

(E)     "Obvious to try" – choosing from a finite number of identified, predictable solutions, with a reasonable expectation of success;

(F)     Known work in one field of endeavor may prompt variations of it for use in either the same field or a different one based on design incentives or other market forces if the variations are predictable to one of ordinary skill in the art; and

(G)     Some teaching, suggestion, or motivation in the prior art that would have led one of ordinary skill to modify the prior art references or to combine prior art reference teachings to arrive at the claimed invention.

## IV.     LEVEL OF ORDINARY SKILL IN THE ART

21.     A person of ordinary skill in the art in the field of the '151 patent would be someone with mechanical knowledge and experience (professional or non-professional) with pliable materials and cardboard containers.  A person of ordinary skill in the art at the time of the claimed inventions could have had a high school diploma.

22.     I reserve the right to amend or supplement this declaration if the Board adopts a definition of a person of ordinary skill other than that described above, which may change my conclusion or analysis.

23.     My opinion below explains how a person of ordinary skill in the art would have understood the technology described in the references I have identified herein around the 2005 time period, which is the approximate date when the application to which the '151 patent claims priority was filed.  I was a person of at least ordinary skill in the art in 2005.

## V.     OVERVIEW OF THE TECHNOLOGY OF THE '240 PATENT

24.     The patent application that ultimately issued as the '151 patent was filed on August 10, 2006, and claims priority to U.S. Provisional Patent Application No. 60/707,079, filed on August 10, 2005.  Ex. 7, pg. 1.  I have seen no evidence that the '151 patent is entitled to an earlier priority date than August 10, 2005.  The '151 patent issued on January 31, 2012.  *Id.*

25.     The '151 patent is the first issued patent in a family of patents that all generally relate to two configuration foldable cardboard caskets that are formed from a single die of cardboard, specifically, to cardboard containers that can be folded into two configurations, one for use and one for storage.  The cardboard caskets referred to in all of the patents in the family, including the '151 patent, are essentially nothing more than foldable cardboard containers that are intended to be used as caskets. *See, e.g.*, *Id.*  For example, the Specification makes little reference to the contents of the containers, other than that the containers may contain "deceased."  The Specification is silent to what the "deceased" refers to, whether it be a human, a large animal, a small animal, etc.  In fact, the word "human" does not exist in the Specification.

26.     As to caskets made from cardboard, the '151 patent recognizes that foldable cardboard is a popular choice in the art for forming caskets, particularly for use in cremation.  Ex. 7, Col. 1, lines 26-34 (references to columns and lines in a patent will hereinafter be made under the following format: x:xx-xx; e.g., Ex. 7, 1:26-34).  The '151 patent notes that this is at least partially due to the fact that they are completely consumed during the cremation process.  Ex. 7, 1:26-34.

27.     As to foldable cardboard containers in general, the '151 patent recognizes that the overall structure of a typical foldable cardboard casket is no different than that of a typical foldable cardboard container, even describing the structure of a cardboard casket as being similar to that of a shoebox.  Ex. 7, 1:45-49.  This is a very apt comparison, as a cardboard casket is actually structurally similar, if not identical, to a typical box-shaped foldable cardboard container (such as a shoebox), the stated use for which is to contain the deceased.

28.     The '151 patent presents a foldable cardboard container that can take two configurations, one for use and another for storage.  Ex. 7, Abstract.  This concept of two

configurations applies to the vast majority of cardboard containers that we encounter in our everyday experience.  A typical cardboard container provides a large-volume shape for use, and a collapsed shape for storage, as identified in the '151 patent.

29.     The claims at issue relate to the structure of a foldable cardboard casket arrangement having a first configuration and a second configuration.  Ex. 7, claims 1-13.  The '151 patent depicts a typical foldable cardboard container as shown below:



FIG. 3

'151 Patent

30.     Notably, the '151 patent utilizes a bottom panel and four side panels, two of which the '151 patent refers to as end panels.  Ex. 7, 2:33-35.  All of the panels are formed from a single die of foldable cardboard.  *Id*.  Typically, the only distinction between sides and ends is the respective aspect ratio.  The '151 patent does not claim a specific aspect ratio.  Without a difference in aspect ratio, side and end panels are merely side walls of a cardboard container.  The only

claimed distinctions between side and end panels are what is attached to the panels (i.e., connecting extensions), how the panels are folded and coupled within each configuration, and where the handholds are located.  The difference in names ("side" and "end") allows the patent owner to apply design differences differently on each side of the cardboard container (i.e., put handles on only two side walls).  A person of ordinary skill in the art would recognize that the side and end panels are merely descriptive to the patent drawings, and for the purposes of a cardboard container, without any specific aspect ratio, a side may be an end, and an end may be a side.  Additionally, a person of ordinary skill in the art would recognize that the various design choices (e.g., flaps or "connecting extensions," handholds, coupling mechanisms, etc.) may be applied throughout the cardboard containers to suit various purposes.  For example, although connecting extensions may be located on the upper section of a side panel, a person of ordinary skill in the art would recognize that it might be advantageous to place connecting extensions on the lower sections of end panels and/or side panels.



*FIG. 3*

*FIG. 4*

BRIDGFORD (PRIOR ART)

31.     An example of prior art is shown above, taken from Bridgford (**Exhibit 13**).  As

shown above (and will be described in more detail below), and as was known in the art, a foldable

cardboard container having a first and second configuration includes a bottom panel and four side

panels.  Two of the panels shown above have a length that is shorter than the length of the other

two panels.  For the purposes of comparison with that of the '151 patent, those two panels will be

referred to as "end panels." At least two of the side panels include a lower section and an upper

section.  The first configuration allows for a maximum volume of storage, because the upper

sections of the side panels extend vertically upward from the lower sections.  In a second configuration, the prior art foldable cardboard container becomes considerably smaller as the upper sections of the side panels fold inwardly, extending inward as they form a top enclosure for the container.



FIG. 5

FIG. 6

BRIDGFORD (PRIOR ART)

32.     As shown above in an embodiment of Bridgford, and as was well known in the prior art, flaps (i.e., "upper connecting extensions, a that term is used in the '151 patent) extend vertically from the upper sections of the side panels.  In the first configuration, as they extend

toward one another from the upper sections of the side panels, they are disposed above the lower sections of the side panels.

33.     Additionally, flaps may include hooks that would engage the small slots in the end panels in order to couple the flaps to the end panels (specifically, as shown in Bridgford, the hooks on flaps 41 to engage with the slots on end panels 38). The hooks of the flaps engage with the slots of the end panels so that the flaps restrict the outward or inward movement of the end panels in the first configuration. In the second configuration, as the upper sections extend inward, the flaps extend downward.

34.     As also shown above, lower flaps (i.e., "lower connecting extensions", as that term is used in the '151 patent), extend outwardly from the lower sections of end panels and are movable independently of the upper flaps (i.e., "upper connecting extensions"). Lower flaps may be collinear with upper flaps. Similar to upper flaps, lower flaps may include hooks for connecting with side panels, as was well known in the prior art. As was known in the prior art, and as would be obvious to a person of ordinary skill in the art at the time of the invention described in the '151 patent, these design choices could be applied to other parts of a foldable cardboard container, such as making the hooks on the upper flaps more prominent such that they couple to the upper sections of end panels in exactly the same manner as the lower flaps couple to the side panels.

35.     As also shown above, the entire structure may be formed of a single piece of pliable material. For instance, the structure may be formed of a single piece of corrugated cardboard. As is known in the prior art, any container may be formed of cardboard material of sufficient qualities (e.g., strength, thickness, fluid absorbability, etc.) to contain the remains of a deceased. Thus, the foldable cardboard containers shown in the prior art are entirely capable of containing the remains of deceased beings, be it an adult human or an infant human.

12

36.     Using the prior art, it would have been obvious to a person of ordinary skill in the art to develop a two-configuration casket arrangement along the lines of a wide array of foldable cardboard containers, as such an arrangement is described in the claims of the '151 patent.  For instance, to develop the casket arrangement described in the claims of the '151 patent, a person of ordinary skill in the art would look to documents describing caskets made of cardboard.  As a cardboard casket bears all of the structural features of a typical foldable cardboard container (e.g., a bottom panel, side panels, and end panels), one would then look to documents describing foldable cardboard containers capable of collapsing into a minimized configuration, or even more readily, to foldable cardboard containers in our everyday experience which generally collapse into a second configuration for storage.

## VI.   CLAIM CONSTRUCTIONS

### A.     Legal Standard

37.     I understand that in deciding whether to grant a Motion for Summary Judgment, there is no genuine issue as to any material fact.

38.     I understand that a patent applicant may be his or her own lexicographer.  I also understand that where a patent applicant explicitly identifies a term to mean something in a patent disclosure, that definition should be used when evaluating terms.

39.     I understand that the plain and ordinary meaning of a term must be used if no explicit definition is provided in the patent specification unless the plain and ordinary meaning would be plainly inconsistent with how the term is being used in the claim or patent specification.

### B.     "Casket Body"

40.     I reviewed the Specification and claims of the '151 patent.  I also reviewed various documents filed in the *inter partes* review proceeding regarding the '151 patent (**Exhibits 2-5**).  In

addition, I reviewed the Decision and Order issued by the United States Court of Appeals in the Federal Circuit on March 27, 2018 (**Exhibit 6**).

41.     According to the Federal Circuit, a "casket body" is "an arrangement capable of receiving or containing the remains of a deceased [human]."  *See* Ex. 6 at 4-5.

42.     For the purpose of my assessment of the '151 patent in light of the prior art, I will consider the prior art and claims of the '151 patent using the Federal Circuit's definition of the term "casket body," which is as follows:

> a.   an arrangement capable of receiving or containing the remains of a deceased human.

## VII.   THE PRIOR ART

### C.     Groh, U.S. Patent No. 5,050,766 ("Groh;" <u>Exhibit 8</u>)

43.     Groh discloses a prior art foldable container arrangement having a first configuration and a second configuration.  Ex. 8, FIGS. 1-3.  The container disclosed by Groh is formed of a unitary piece of pliable material.  Ex. 8, 2:15-21.  The container includes a bottom panel, end panels, and side panels.  Ex. 8, 2:15-21, *see also* Ex. 8, FIGS. 1-3.

44.     The bottom panel, end panels, and side panels collectively form a "casket body" as the term is applied in the claims of the '151 patent.  Specifically, the "body" shown in Groh contains all of the necessary structural elements and is thus capable of containing the remains of a deceased human being.  For instance, a search of consumer and commercial ice chests reveals dimensions suitable to contain the remains of adult males in the United States.  *Compare* **Exhibit K** (disclosing an ice chest with a length of 72 inches, width of 24.5 inches, and height of 25 inches – perimeter of 99 inches based on width and height) *with* **Exhibit L**, pg. (disclosing a mean height of 69.2 inches, a mean sagittal abdominal diameter (i.e., abdominal width from back to front) of

23.3 inches, and a waist circumference of 101.5 centimeters (i.e., approx. 40 inches) for human males aged 20 years and over). Additionally, such ice chests may be reduced in size, and are generally suitable for containing the remains of a significant portion of small human beings (e.g., infants, small children, etc.). *Compare* **Exhibit K** (disclosing an ice chest with a length of 72 inches, width of 24.5 inches, and height of 25 inches) *and* **Exhibit M** (disclosing smaller ice chests) *with* **Exhibit L** (disclosing a mean height of 36.3 inches, a mean sagittal abdominal diameter of 14.2 inches, and a waist circumference of 48.7 centimeters (i.e., approx. 19 inches) for children aged 2 years).

45.     The foldable cardboard container disclosed by Groh would need to be constructed using cardboard material having suitable size and strength to fulfill the market needs of consumer and commercial ice chests, both small and large. Accordingly, persons of ordinary skill in the art who desire a foldable, collapsible (i.e., two configuration) cardboard container will appreciate that the foldable, collapsible cardboard container disclosed by Groh could readily be constructed using cardboard material having suitable size and strength to contain other desirable contents, including the body of a deceased human being in various positions, including a supine position.

46.     Both the side panels and the end panels include lower sections and upper sections. Ex. 8, FIGS. 1-2; Ex. 8, 2:48-51 ("Each of the end panels 26 and 27, and side panels 24 and 25, are provided with a fold or score line 40 and 42, respectively, which serves to divide panels 24 through 27 into upper and lower panel portions.").

47.     In a first configuration, the upper sections of the side and end panels extend vertically upward from their respective lower sections, but extend in a direction other than vertically upward when the container is in the second configuration. *See* Ex. 8, 2:54-64 ("[F]old lines 40 and 42 act together with diagonal fold lines 44 formed in the upper portions of the side

panels 24 and 25 to permit collapsing of the upper panel portions of the ends 26, 27 and sides 24, 25.").

48.     Additionally, Groh includes a lid disposed over the side panels, end panels, bottom panel, and contents of the container (e.g., an insert tray) when the container is in the first configuration or the second configuration.  Ex. 8, 3:10-17, FIGS. 1-3.

**D.     Gillard, U.S. Patent No. 5,623,752 ("Gillard;" <u>Exhibit 9</u>)**

49.     Gillard was issued on April 29, 1997.  Ex. 9.

50.     Gillard discloses a foldable cardboard container arrangement – specifically, a casket – having a casket body for receiving the body of a deceased human.  Ex. 9, 1:6-10.

51.     Although a deceased is not explicitly shown in any of the figures in Gillard, it would be understood by persons of ordinary skill in the art, as well as any person, including a layman, who has seen a deceased human at rest within a coffin, that a coffin is capable of containing the remains of at least a deceased human being in a supine position.

52.     The container of Gillard includes a bottom panel, side panels, and end panels.  Ex. 9, 2:24-29.  The container of Gillard, including the bottom panel, side panels, and end panels, is formed of a pliable material.  *Id.*

**E.     Watson, U.S. Patent No. 3,346,399 ("Watson;" <u>Exhibit 10</u>)**

53.     Watson was issued on October 10, 1967.  Ex. 10.

54.     Watson discloses a foldable cardboard container having two configurations: a first configuration for use, and a collapsed second configuration for shipping and storage.  Ex. 10, FIGS 1-4.

55.     Watson discloses a bottom panel, side panels and end panels.  Ex. 10, FIGS. 1-5. The side panels include a lower section and an upper section.  *Id*.  The end panels are formed of lower end panels and upper end panels.  *Id*.

56.     Similar to Groh, the bottom panel, end panels, and side panels of Watson collectively form a "casket body" as the term is applied in the claims of the '151 patent.  As such, Watson discloses a container arrangement capable of containing the remains of at least a human being.

**F.     Dove, U.S. Patent No. 4,101,052 ("Dove;" <u>Exhibit 11</u>)**

57.     Dove was issued on July 18, 1978.  Ex. 11.

58.     Dove discloses a foldable cardboard container arrangement with an expanded first configuration, and collapses into a second configuration.  Ex. 11, FIGS. 1-2.  The container in Dove includes a bottom panel, side panels, and end panels.  Ex. 11, FIGS. 1, 9.

59.     Similar to Groh and Watson, the bottom panel, end panels, and side panels of Dove collectively form a "casket body" as the term is applied in the claims of the '151 patent.  As such, Watson discloses a container capable of containing the remains of at least a human being in at least the expanded first configuration.

60.     The side panels have lower sections and upper sections, while the end panels are formed of lower end panels and upper end panels.  Ex. 11, FIG. 1, 4.  Dove further discloses an upper connecting extension coupled at one end to an upper end panel, and configured to couple to an upper section in the first configuration, and further configured to be spaced apart from the upper section in the second configuration.  Ex. 11, FIG. 3.

**G.     Berney, U.S. Patent No. 1,771,766 ("Berney;" <u>Exhibit 12</u>)**

61.     Berney was issued on August 5, 1929.  Ex. 12.

62.     Berney discloses a foldable cardboard container that includes a body and a cover. Ex. 12, col. 2, lines 90-95.  These two components (the body and the cover) are secured to one another by a single fastener: and cable that also serves as a handle.  *Id.*  A defining aspect of Berney is its cable, which acts as both a fastener and handle.  Ex. 12, 1:1-9.

**H.     Bridgford, U.S. Patent No. 3,502,488 ("Bridgford;" <u>Exhibit 13</u>)**

63.     Bridgford was issued on March 24, 1970.  Ex. 13.

64.     Bridgford discloses multiple prior art foldable cardboard containers used for storage and transport of baked goods.  Ex. 13.

65.     As shown in FIGS. 1 and 3 of Bridgford, Bridgford discloses a foldable cardboard container having a first configuration and a second configuration.  Ex. 13, FIGS. 1-3.  The container disclosed by Bridgford includes side panels and end panels intrinsically formed of a single piece of pliable material.  *Id.*  As shown in FIG. 1, the side panels include a lower section and an upper section that are foldably attached to one another.  Ex. 13, FIG. 1.

66.     In a first configuration disclosed in FIG. 1, the lower section extends vertically upward, while the upper section, in the first configuration, extends upward from a top portion of the lower section. Ex. 13, FIG. 1.  In a second configuration disclosed in FIG. 3, the upper section of the side panels extend in a direction other than vertically upward from the top portion of the lower section.  *See* Ex. 13, FIG. 3.

67.     As also shown in FIG. 1, the end panels **a)** have a length that is less than that of the side panels; and **b)** include a lower section and an upper section that are foldably attached to one another.  Ex. 13, FIG. 1.  In a first configuration disclosed in FIG. 1, the lower section extends vertically upward, while the upper section, in the first configuration, extends upward from a top portion of the lower section.  Ex. 13, FIG. 1.  In a second configuration disclosed in FIG. 3, the

upper section of the end panels extends in a direction other than vertically upward from the top portion of the lower section.  Ex. 13, FIG. 2.

68.     As shown in FIG. 6, Bridgford includes an alternative arrangement to that of FIGS. 1 and 3, also having a first configuration and a second configuration (while the second configuration of the alternative arrangement is described in the Specification, only the first configuration is shown in the figures (i.e., FIG. 6)).  Ex. 13, FIGS. 1-3 and 6.

69.     FIG. 5 of Bridgford shows the alternative arrangement of FIG. 6, as a yet unassembled state, as an unfolded sheet.  Ex. 13, FIGS. 5-6.  As shown in FIG. 5, the alternate arrangement disclosed in Bridgford includes a bottom 33 formed of a pliable material (base panel 33, as part of a unitary blank 32 formed of aluminum faced cardboard).  *Id*.  Coupled to the bottom is a pair of side panels that are also formed of pliable material (wall panel 34 and extension panel 40, collectively).  *Id*.  The side panels in FIG. 6 include a lower section and an upper section foldably attached to one another (wall panel 34 and extension panel 40, respectively).  *Id*.  Also coupled to the bottom is a pair of end panels 38 on opposite ends of the bottom.  *Id*.

70.     Collectively, in each of the arrangements described by Bridgford, the bottom panels, side panels, and the end panels collectively form bodies for containing objects.  Ex. 13, FIGS. 1-6.  Similar to Groh, Watson, and Dove, Bridgford is perfectly capable of containing the remains of a deceased human being.

71.     In fact, persons of ordinary skill in the art who desire a foldable, collapsible (i.e., two configuration) cardboard container will appreciate that the foldable, collapsible cardboard container disclosed by Bridgford could readily be constructed using cardboard material having suitable size and strength to contain other desirable contents, including the body of a deceased human being.  For instance, a search of consumer and commercial ice chests reveals dimensions

suitable to contain the remains of adult males in the United States.  *Compare* **Exhibit K** (disclosing

an ice chest with a length of 72 inches, width of 24.5 inches, and height of 25 inches – perimeter

of 99 inches based on width and height) *with* **Exhibit L**, pg. (disclosing a mean height of 69.2

inches, a mean sagittal abdominal diameter (i.e., abdominal width from back to front) of 23.3

inches, and a waist circumference of 101.5 centimeters (i.e., approx. 40 inches) for human males

aged 20 years and over).  Additionally, such ice chests may be reduced in size, and are generally

suitable for containing the remains of a significant portion of small human beings (e.g., infants,

small children, etc.).  *Compare* **Exhibit K** (disclosing an ice chest with a length of 72 inches,

width of 24.5 inches, and height of 25 inches) *and* **Exhibit M** (disclosing smaller ice chests) *with*

**Exhibit L** (disclosing a mean height of 36.3 inches, a mean sagittal abdominal diameter of 14.2

inches, and a waist circumference of 48.7 centimeters (i.e., approx. 19 inches) for children aged 2

years).

72.     As shown in FIG. 5, Bridgford discloses a pair of end panels coupled to the bottom

(side wall panel 36 and side wall extension panel 38, collectively) that are shorter than the side

panels. Ex. 13, FIG. 5.  As shown in FIG. 6, in a first configuration, the side panels (wall panel

34) extend vertically upward from the bottom (not shown in FIG. 6), while the upper sections

extend upward from a top portion of the lower sections (extension panel 40 extending upward in

FIG. 6).  Ex. 13, FIG. 6.  In a second configuration the upper sections extend in a direction other

than vertically upward from the top portion of the lower section (column 4, lines 23-35).  Ex. 13,

4:23-35.

73.     Also shown in FIG. 6, Bridgford's alternate arrangement includes a pair of flaps

extending laterally from, and foldably attached to, each end of the upper sections (tabs 41).  Ex.

13, FIG. 6.  In the first configuration, the flaps are disposed completely at or above a vertical level

defined by the top portion of a lower section of either of the side panels or end panels.   *Id*. Additionally, the flaps of opposing upper sections extend from their respective upper sections toward each other in the first configuration.   *Id*.   In the second configuration, the flaps extend downward from that vertical level (by being brought into superimposition with the outer faces of the lower sections of the end panels, as shown in column, 4, lines 27-35).   Ex. 13, 4:27-35.

74.    As also shown in FIG. 6, Bridgford's alternate arrangement discloses a lower connecting extension (i.e., flap) extending laterally from, and foldably attached to, each end of each lower section (locking tabs 37).   Ex. 13.   These lower connecting extensions fold independent of the flaps of the upper sections.   *See* Ex. 13, FIGS. 5 & 6 (flaps 41 and locking tabs 37 are completely separate components that fold independently of one another).

75.    As shown in FIG. 5, each flap includes a hook at a corner (specifically, the corner most distal from the center of the blank) of its respective flap.   Ex. 13, FIG. 5.   As also shown in FIG. 5, each end panel includes two slots for coupling to two adjacent flaps such that the hook of a flap locks into a respective slot of an end panel.   *Id*.   Although not explicitly stated in Bridgford, but as shown in FIGS. 5 and 6, the hooks of the flaps (tabs 41) are configured to engage the slots of the end panels (end panels 38), and it would have been obvious to a person of ordinary skill in the art that the purpose of the hooks would be to interlock with the slots of the end panels (e.g., to keep the end panels from shifting inward and thereby partially closing the container while the container is meant to be maintained in the first configuration for receiving dough or any other desired contents prior to converting the container in the second configuration for storage).   *See* Ex. 13, FIGS. 5-6.

## VIII.   OBVIOUSNESS COMBINATIONS – MOTIVATIONS TO COMBINE

### A.   Groh in view of Gillard

76.        It would have been obvious to modify the teachings of Groh with that of Gillard to disclose each and every element of the pertinent claims of the '151 patent.  Firstly, this is because both references deal with the same technology – cardboard container arrangements. Groh contains all of the structural components of the claims except the explicit ability to contain the body of a deceased human in any position, let alone the supine position.  However, if a person of ordinary skill in the art was in need of a foldable cardboard container for containing the remains of a deceased human, such a person would not limit their inspiration to caskets.  The person of ordinary skill in the art would look to foldable cardboard containers in general.  This is because not only is it well known in the art of funerary products that foldable cardboard containers are versatile and known to hold a variety of things, including deceased human bodies, but it is also common sense even to a layman that foldable cardboard containers are so versatile. As such, a person of ordinary skill in the art would easily come across Groh (or Bridgford, Dove, Watson, or any of the plethora of foldable cardboard containers that can be constructed to the necessary size and strength to contain a deceased human body) and would adapt it so that the foldable cardboard container of Groh is constructed to have the size and strength of the foldable cardboard container of Gillard.  It should also be noted that foldable cardboard containers are known to be so versatile, that Matthews has identified four different purposes for which foldable cardboard containers that include all of the structural elements of the claims are used in the prior art (claim 1 is used as a casket, an identical container is used by Groh as an ice chest, identical containers are used by Watson and Bridgford as bread boxes, an identical container is used by Dove as an all-purpose container).

77.        It should also be noted that the Federal Circuit, in its Decision and Order, hinted that the claims of the '151 patent may well be obvious in light of a combination that folds a cardboard casket in the manner described by Groh.  Ex. 6, pg. 5 ("The claims at issue here may well be unpatentable as obvious in light of prior art disclosing cardboard caskets and disclosing the folding of cardboard boxes in the manner described by the patent.").

78.        Accordingly, it would have been obvious to a person of ordinary skill in the art (as well as a person of common sense) to modify the two-configuration foldable cardboard container of Groh with the foldable cardboard container of Gillard in order to produce the two-configuration foldable cardboard container of each and every claim of the '151 patent (i.e., constructing a casket with the shape of Groh to any desired size).

**B.        Groh in view of Gillard, and further in view of Dove**

79.    It would have been obvious to add Dove to the combination of Groh and Gillard. The main reason for this is because each reference relates to the same technology – foldable cardboard containers.   In fact, both Groh and Dove disclose two-configuration, collapsible cardboard containers (the collapsed configurations being highly desirable for shipping and storage) that include all of the structural features recited in claim 1 of the '151 patent.  It would have been obvious to one of ordinary skill in the art to include a connecting extension that folds inward when collapsing the container into the second configuration.  By the very nature of the connecting extension folding inward, the connecting extension becomes spaced apart from adjacent side/end panels.  Accordingly, it would have been obvious to one of ordinary skill in the art to combine the teachings of Dove with those of Groh and Gillard.

C.      **Groh in view of Gillard, and further in view of Watson**

80.      A person of ordinary skill in the art would have been motivated to combine the teachings of Watson with the teachings of Groh, as well as the teachings of Gillard.

81.      The main reason for this is because each reference relates to the same technology – foldable cardboard containers.  In fact, both Groh and Watson disclose two-configuration, collapsible cardboard containers that include all of the structural features recited in claim 1 of the '151 patent.  Persons of ordinary skill in the art of constructing foldable cardboard containers would appreciate that the connecting extensions disclosed in Watson could have easily been incorporated into the foldable cardboard container disclosed in Groh, which can be easily constructed with increased size and strength necessary to function as a casket body.  Accordingly, it would have been obvious to persons of ordinary skill in the art to combine the upper and lower connecting extensions of Watson with the side and end panels of Groh to construct a casket as described in the claims of the '151 patent.

D.      **Groh in view of Gillard and further in view of Berney**

82.      It would have been obvious to one of ordinary skill in the art to combine the teachings of Berney with those of Groh and Gillard.  The main reason for this is because each reference relates to the same technology – foldable cardboard containers.  Berney specifically relates to fastening components of foldable cardboard containers together using a cable tie that also functions as a handle.  Additionally, it is well known in the art, as well as common sense, to fasten two things together using any type of fastener, and that sometimes that fastener (also known as a rope, cord, cable tie, etc.) might also function as a handle.

1504948.000 - 5202

### E.     Bridgford in view of Gillard

83.     It would have been obvious to modify the teachings of Bridgford with that of Gillard to disclose each and every element of the pertinent claims of the '151 patent.  Bridgford contains all of the structural components of the claims except the explicit ability to contain the body of a deceased human in any position, let alone the supine position.  However, if a person of ordinary skill in the art was in need of a foldable cardboard container for containing the remains of a deceased human, such a person would not limit their inspiration to caskets.  The person of ordinary skill in the art would look to foldable cardboard containers in general.  This is because not only is it well known in the art of funerary products that foldable cardboard containers are versatile and known to hold a variety of things, including deceased human bodies, but it is also common sense that foldable cardboard containers are so versatile, as explained above.  As such, a person of ordinary skill in the art would easily come across Bridgford (or Groh, Dove, Watson, or any of the plethora of foldable cardboard containers that can be constructed to the necessary size and strength to contain a deceased human body) and would adapt it with Gillard so that the foldable cardboard container of Bridgford is constructed to have the needed size and strength to function as a casket.

84.     Accordingly, it would have been obvious to a person of ordinary skill in the art (as well as a person of common sense) to modify the two-configuration foldable cardboard container of Bridgford with the foldable cardboard container of Gillard in order to produce the two-configuration foldable cardboard container of each and every claim of the '151 patent.

### F.     Bridgford in view of Gillard and further in view of Groh

85.     It would have been obvious to add the teachings of Groh to the combination of Bridgford and Gillard.  The main reason for this is because each reference relates to the same

technology – foldable cardboard containers.   In fact, both Bridgford and Groh disclose two-configuration, collapsible cardboard containers that include all of the structural features recited in at least claim 1 of the '151 patent.   Caskets are generally known in the art, as well as to laymen, for having lids.   Thus a person of ordinary skill in the art would look to prior art that discloses lids for motivation.   The person of ordinary skill in the art would easily have come across Groh and would have made the obvious decision to place a lid onto the container of Bridgford (as modified into a casket by Gillard) in order to provide a) a "closed casket;" and/or b) a lid for shipping and storage.   Further, it must be noted that lids are well known in the art and to laymen as being suitable mechanisms of closing and/or sealing cardboard containers, and the incorporation of a lid would be an obvious design choice.

### G.   Bridgford in view of Gillard and further in view of Dove

86.     It would have been obvious to add Dove to the combination of Bridgford and Gillard.   Each reference relates to the same technology – foldable cardboard containers.   In fact, both Bridgford and Dove disclose two-configuration, collapsible cardboard containers that include all of the structural features recited in claim 1 of the '151 patent.   Additionally, both Bridgford and Dove disclose upper connecting extensions.   It would have been obvious to persons of ordinary skill in the art to modify the upper connecting extensions of Bridgford so that they can that fold inward when collapsing the container into the second configuration.   Additionally, both Bridgford and Dove disclose that the upper connecting extensions become spaced apart from adjacent side/end panels in the second configuration.   Accordingly, it would have been obvious to one of ordinary skill in the art to combine the teachings of Dove with those of Bridgford and Gillard.

### H.      Bridgford in view of Gillard and further in view of Berney

87.      It would have been obvious to one of ordinary skill in the art to combine the teachings of Berney with those of Bridgford and Gillard.  Each reference relates to the same technology – foldable cardboard containers.  Berney specifically relates to fastening components of foldable cardboard containers together using a cable tie that also functions as a handle. Additionally, it is well known in the art, as well as common sense, to fasten two things together using any type of fastener, and that sometimes such a fastener (also known as a rope, cord, cable tie, etc.) might also function as a handle.

### I.      Bridgford in view of Gillard and further in view of Watson

88.      It would have been obvious to one of ordinary skill in the art to combine the teachings of Watson with those of Bridgford and Gillard.  Each reference relates to the same technology – foldable cardboard containers.  In fact, both Bridgford and Watson disclose two-configuration, collapsible cardboard containers that include all of the structural features recited in claim 1 of the '151 patent.  Persons of ordinary skill in the art of constructing foldable cardboard containers would appreciate that the coupling mechanism (i.e., the "slot") disclosed in Watson could have easily been incorporated into the foldable cardboard container disclosed in Bridgford, which can be easily constructed with increased size and strength necessary to function as a casket body.  Accordingly, it would have been obvious to persons of ordinary skill in the art to combine the coupling mechanism of Watson with the side and end panels of Bridgford to construct a casket as described in the claims of the '151 patent.

## IX.      GROUNDS OF INVALIDITY

I detail how the prior art invalidates the claims at issue in the claim charts filed herewith as **Exhibits A-I**.  In summary, my opinions are as follows:

89.      It is my opinion that claims 1, 2, 9, 11, and 13 of the '151 patent are invalid under 35 U.S.C. § 103 as obvious over Groh in view of Gillard.

90.      It is my opinion that claims 3 and 4 is invalid under 35 U.S.C. § 103 over Groh, in view of Gillard, and further in view of Dove.

91.      It is my opinion that claim 5, 6, 8, 10, and 12 are invalid under 35 U.S.C. § 103 over Groh in view of Gillard, and further in view of Watson.

92.      It is my opinion that claims 6 and 7 are invalid under 35 U.S.C. § 103 over Groh in view of Gillard, and further in view of Berney.

93.      It is my opinion that claims 1, 3, 5, 6, 8-13 of the '151 patent are invalid under 35 U.S.C. § 103 as obvious over Bridgford in view of Gillard.

94.      It is my opinion that claim 2 of the '151 patent is invalid under 35 U.S.C. § 103 as obvious over Bridgford in view of Gillard, and further in view of Groh.

95.      It is my opinion that claim 4 of the '151 patent is invalid under 35 U.S.C. § 103 as obvious over Bridgford in view of Gillard, and further in view of Dove.

96.      It is my opinion that claim 7 of the '151 patent is invalid under 35 U.S.C. § 103 as obvious over Bridgford in view of Gillard, and further in view of Berney.

97.      It is my opinion that claim 12 of the '151 patent is invalid under 35 U.S.C. § 103 as obvious over Bridgford in view of Gillard, and further in view of Watson.

## X.     DECLARATION

98.     I declare that all statements made herein on my own knowledge are true and that all statements made on information and belief are believed to be true, and further, that these statements were made with knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

Respectfully submitted,

_____

Joseph F. Rakow, PhD

Date: December 31, 2018